**Opinion issued April 18, 2013**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-11-01019-CR**

———————————

**TRACY BLAINE FRANCIS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 228th District Court**
**Harris County, Texas**
**Trial Court Case No. 1282094**

---

**DISSENTING OPINION**

I respectfully dissent. The majority affirms the conviction of appellant, Tracy Blaine Francis, for the felony offense of aggravated robbery and his seventy-five-year sentence. *See* TEX. PENAL CODE ANN. § 29.03(a)(2), (3) (Vernon 2011).

I would reverse the conviction and remand for a new trial on the ground that the State willfully violated a discovery order by withholding a machete offered as used during the commission of the charged offense—but actually used in the commission of an uncharged extraneous offense—with the intent of thwarting the defense's preparation for trial, in violation of Code of Criminal Procedure article 39.14. *See* TEX. CODE CRIM. PROC. ANN. art. 39.14(a) (Vernon Supp. 2012). I agree with Francis that the trial court erred with respect to the admission of this evidence during the guilt phase of trial and that the error was harmful. Therefore, Francis's conviction should be reversed and the case remanded for a new trial.

**Background**

As the majority states, Francis was indicted for the felony offense of aggravated robbery on October 14, 2010, based on the allegation that he "unlawfully, while in the course of committing theft of property owned by DEBORAH THOMAS, and with intent to obtain and maintain control of the property, INTENTIONALLY AND KNOWINGLY threaten[ed] and place[d] DEBORAH THOMAS in fear of imminent bodily injury and death, and [Francis] did then and there use and exhibit a deadly weapon, namely, A KNIFE." Thomas had been Francis's girlfriend a number of years before and was the mother of his child. At the time of the assault, Thomas and Francis had renewed their relationship, and Francis had moved in with Thomas.

2

On June 21, 2011, approximately five months prior to the November 16, 2011 trial, Francis's counsel filed "Defendant's Request for Notice of State's Intention to Use Evidence of Extraneous Offenses at Trial." On July 16, 2011, the trial court entered a discovery order that ordered the State to furnish to the defense "[a]ll physical objects to be introduced as part of the State's case" as well as "[a]ll contraband, weapons, [and] implements of criminal activity seized or acquired by the State or its agents in the investigation of the alleged offense." The order specified that "the State is ordered to furnish the above for inspection and copying 10 working days before trial, or as soon as reasonably practicable after any such information comes to their knowledge, whichever is earlier."

In response to the court's discovery order, on September 6, 2011, two months prior to trial, the State filed its "Notice of Intention to use Evidence Pursuant to Texas Rules of Criminal Evidence 404, 609, and 37.07(g)." The State gave no notice of its intent to introduce evidence of the use of a machete in the assault or in any capacity. It did, however, state, "ON THE SAME DAY AS THIS OFFENSE, THE DEFENDANT THREATENED MULTIPLE PEOPLE WHO WORKED IN THE LEASING OFFICE WITH A KNIFE."

The trial, before a visiting judge, began on November 14, 2011. At trial, after the jury was sworn, but prior to the presentation of evidence, Francis's counsel conferred with the State about the evidence the State intended to present.

3

For the first time, Francis became aware that the State had a machete in its possession and had marked it as an exhibit. The machete was distinctly different and separate from the knife alleged to have been used in the case and described in the official offense report. The police had been unable to recover that knife, and it did not appear among the exhibits. No machete was mentioned in any reports, witness statements, or documents produced to the defense prior to trial.

Citing his timely request for notice under Rule 404, Francis objected to the machete's "introduction in any way." In reply to the court's remonstrance that a machete is "just a big knife," Francis announced his understanding that the machete was not the knife alleged in the indictment. The prosecution affirmed for the first time that "two knives . . . were used that night, this one and another one." The court replied, "Well, possession of a machete in itself is not necessarily an extraneous offense." The court granted a continuance with respect to the machete to allow Francis's counsel time to inspect the machete and confer with his client in preparation for trial. The court also granted a motion in limine protecting the Francis's right to object should the machete be brought into the trial.

The first witness, Officer M. Scott, who had responded to Thomas's 911 call, testified that he thought he was responding to an unarmed assault. He did not recall Thomas mentioning a knife, only a beating. He testified that no knife was

found at the scene, mentioned by the other responding officers, or mentioned in the police report. He saw no evidence of a knife wound on Thomas.

The next witness, Susan Myers, a counselor in the family violence unit of the Houston Police Department, interviewed Thomas when she came to the department on October 16, 2010, to pursue charges. She testified that Thomas had been badly beaten. On cross-examination, Myers admitted that her report of the interview did not mention a knife but rather recorded that Thomas was beaten with fists. On re-direct, however, she admitted that a knife was mentioned in Thomas's statement.

The next morning, before the jury was brought in, the trial court agreed to take up the motion in limine and stated, "It appears as though from my conversation with [defense counsel], he's had a chance to inspect the machete in question and has had ample opportunity to speak to his client about it and prepare for cross-examination." Defense counsel replied, "That is correct, Judge. Although it doesn't eliminate the objections that will be made." The judge replied, "Certainly," and stated that he would address the objections as they arose.

The State then called Thomas, who began to testify about the events leading up to the charged crime. After Thomas had described the beating and the theft of money from her bra, the State asked, "During the time that he was beating you, did he ever make any threats to you?" In response to Thomas's answer, "Yes," the

5

State asked, "Okay. Can you tell us about that?" She replied, "In the process of him beating me—there's a machete that was laying right beside me."

The court called a bench conference and excused the jury. Francis objected "initially" on Rule 404(b) grounds that there was no evidence that the machete was used in the offense in any way and that it was his understanding that "the State is contending that it was simply there and it was not used to threaten the complainant. And additionally, the police reports indicate that if there was a knife used, it was a kitchen knife." He stated that the defense's first indication "that a machete was going to be talked about or introduced into evidence was yesterday after the jury had already been impaneled." During the lunch break, defense counsel observed the machete, asked about it, "and was then told it was going to be introduced into evidence."

Francis also objected that introduction of the machete violated the discovery order signed by the original judge on July 16, 2011, which specifically required that the State turn over any weapons or other contraband involved in the offense ten days ahead of trial. The State replied that, earlier that day she had explained to the court "that [Thomas] was threatened with this machete, that [Francis] said he was going to chop her up into little pieces and using the machete. And he had it laying by her threatening her with it." She further stated that she "brought the machete as evidence"; that she intended to offer it at trial; that defense counsel told

6

her he had not seen it; that "[she] did receive the machete from [the complainant] when [she] went to interview her in preparation for trial . . . before the last trial setting"; and that it had been in her possession since that time; but that she "honestly didn't know that the defense didn't know about the machete. [She] thought that it was in the offense report, but it wasn't."

The trial court stated on the record that he had granted "a short continuance to give the defense time to inspect to see if there was something unique about the machete or something else that needed to be done that would enable [defense counsel] to properly represent [his] client" and that the court's "understanding was that [defense counsel] had plenty of time to look at it, to examine it and to talk to [his] client about it and prepare for cross-examination or whatever may occur in trial."

Francis re-urged his objection that he had not been told about the machete until the day before and that he had not had the opportunity to do any further investigation beyond talking to Francis. He further objected that "if this machete was found in September and the [discovery] order was granted in July and we just found out about it yesterday, then this is a violation of that discovery order under 39.14" and, therefore, the machete was "inadmissible because of that."

When the trial court asked the State to proffer Thomas's testimony, the prosecutor replied:

I anticipate that her testimony is going to be that the defendant had the machete as well as a kitchen knife. That he put the machete next to her and told her that he was going to cut her up into little pieces as he threatened her with the knife. He held the knife to her. He moved the knife down her body. Put the knife into her vagina and told something along the lines of I could really fuck you up. And then after that, then took the money and left.

I anticipate that she's going to say that she doesn't—she doesn't—she hasn't seen the knife since that night, which would indicate that he took the knife with him. But he did leave the machete. And so, the machete was there. The police did not take it.

When she talked to Ms. Logan, who was the prosecutor in the court before me, she told Ms. Logan about the machete as well, which was in Ms. Logan's notes, which was in the file that was open to defense counsel . . . .

The court asked if the notes were work product or notes that were available to Francis's counsel, and the State replied, "It was her notes. I don't know if she had them in a work product folder or not. I don't know that. But there were notes in the file." Francis's counsel volunteered that he seen notes about Francis's sharpening a machete in connection with Francis's sharpening knives fourteen hours prior to the event, but he stated that he did not know the machete was present during the offense, and he had no way to know that it was in the State's possession "because they went and got it" and it was not in the police report. He stated that the intended use of the machete at trial as evidence of the event was a surprise that affected his trial strategy. The trial court expressly overruled Francis's Rule

8

404(b), Rule 402,[1] and article 39.14 objections. The State then questioned Thomas extensively about the details of the attack with the machete, which was introduced into evidence, in addition to testifying in detail about Francis's attack on her with the knife and with his fists.

## Violation of Discovery Order

In his first issue, Francis argues that the trial court erred by admitting the machete into evidence during the guilt phase of trial because the State willfully withheld the machete's existence contrary to the trial court's discovery order, violating Code of Criminal Procedure article 39.14.

### 1. *Willful Violation of Discovery Order*

In reviewing the trial court's decision to admit or exclude evidence, the appellate court must determine whether the court's decision was an abuse of discretion. *Oprean v. State*, 201 S.W.3d 724, 726 (Tex. Crim. App. 2006). Unless it was "outside the 'zone of reasonable disagreement,'" the decision must be upheld. *Id.* When the trial court makes findings of fact based on an evaluation of credibility and demeanor, we should show almost total deference to those findings. *Id.* (quoting *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). If the trial court does not enter findings of fact, we view the evidence in the light most favorable to the ruling and assume the trial court made implicit findings of fact that

---

[1] Rule 402 provides that irrelevant evidence is inadmissible. TEX. R. EVID. 402.

support the ruling as long as those findings are supported by the record. *Id.* (quoting *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000)).

Texas Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith," but it may be admissible for other purposes, "provided that upon timely request by the accused in a criminal case, reasonable notice is given in advance of trial of intent to introduce in the State's case-in-chief such evidence other than that arising in the same transaction." TEX. R. EVID. 404(b).

Texas Code of Criminal Procedure article 39.14 provides that, upon the defendant's motion, the court shall order the State, pretrial, "to produce and permit the inspection . . . of . . . objects or tangible things not privileged, which constitute or contain evidence material to any matter involved in the action and which are in the possession, custody or control of the State or any of its agencies." TEX. CODE CRIM. PROC. ANN. art. 39.14(a). "Evidence willfully withheld from disclosure under a discovery order should be excluded from evidence." *Oprean*, 201 S.W.3d at 726 (quoting *Hollowell v. State*, 571 S.W.2d 179, 180 (Tex. Crim. App. 1978)).

To determine a violation of a discovery order under article 39.14, the appellate court must determine whether the State acted voluntarily and with the specific intent to willfully disobey the order. *Id.* The State's intent to willfully

10

disobey the discovery order may be inferred from its actions and words. *Id.* at 728.

We consider "whether the record indicates that (1) the prosecutor intended to harm

the defense, (2) the prosecutor's actions were a strategic and purposeful effort to

thwart the defense's preparation of its case, or (3) the prosecutor consciously

decided to violate the plain directive of the discovery order." *Walker v. State*, 321

S.W.3d 18, 22 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd, untimely filed);

*see Oprean*, 201 S.W.3d at 727–28. The appellate court also considers the validity

of the State's rationale and explanation for violating the discovery order, as well as

whether it suddenly discovered the evidence such that compliance with the terms

of the discovery order was impossible. *See Oprean*, 201 S.W.3d at 727–28.

In *Oprean*, the trial court signed a discovery order requiring the State to

furnish, at least ten days before trial, "[a]ll video and tape recordings that contain

the defendant's voice." *Id.* at 725. After a jury found Oprean guilty of felony

DWI, defense counsel asked the State what evidence she intended to present at the

punishment phase the next morning. *Id.* The prosecutor stated that she intended to

present only the judgments and sentences from Oprean's prior DWI convictions.

*Id.* Right before the punishment phase began, defense counsel learned, when he

asked the prosecutor about the presence of a police officer in the courtroom, that

she intended to offer a videotape depicting one of Oprean's prior convictions. *Id.*

Defense counsel objected to admission of the videotape on the ground that the

11

State violated the discovery order. *Id.* The trial court overruled this objection and denied defense counsel's request for a recess to inspect the videotape and prepare a strategy. *Id.*

In concluding that the State acted with the specific intent to willfully disobey the discovery order, the Court of Criminal Appeals found two things "particularly unacceptable about the prosecutor's conduct." *Id.* at 727. First, she specifically told defense counsel the night before the punishment phase that she intended to offer only the judgments and sentences, and there was no indication that she did not discover the existence of videotape until after that conversation. *Id.* Second, the prosecutor's explanation for her conduct—that "there was no [37.07] charge in [the] court's discovery order"—was invalid, which is a factor that should be considered when determining willfulness.[2] *Id.* at 727–28. The court concluded

---

[2] Code of Criminal Procedure article 37.07, section 3(g), which applies to the punishment phase, provides, "On timely request of the defendant, notice of intent to introduce evidence under this article shall be given in the same manner required by Rule 404(b), Texas Rules of Evidence." TEX. CODE CRIM. PROC. ANN. art. 37.07 § 3(g) (Vernon Supp. 2012). In *Oprean v. State*, after defense counsel objected to the introduction of the videotape on the ground that the prosecutor violated the discovery order, the prosecutor stated, "[T]here was no [Article 37.07(g)] charge in this Court's discovery order and no [37.07] request was ever made by defense counsel, which is required to be made to me to give him this evidence." 201 S.W.3d 724, 725 (Tex. Crim. App. 2006). Although *Oprean* involved the admission of evidence wrongfully withheld in violation of a discovery order in the punishment phase of trial, this Court has applied *Oprean* in situations in which the trial court admits evidence withheld in violation of a discovery order in the guilt-innocence phase of trial. *See Walker v. State*, 321 S.W.3d 18, 22–23 (Tex. App.—Houston [1st Dist.] 2009, pet. dism'd, untimely filed); *see also Hall v. State*, 283 S.W.3d 137, 163–69 (Tex. App.—Austin 2009,

that "[b]ecause the prosecutor knew about the discovery order and chose to invoke Article 37.07 after counsel called her attention to the order, she made a conscious decision to violate the plain directive of the discovery order." *Id.* at 728. The court held that the prosecutor's conduct was a "calculated effort to frustrate the defense" and remanded the case to this Court to determine the harm, if any, caused by admission of the videotape. *Id.*; *cf. State v. LaRue*, 152 S.W.3d 95, 96–97 (Tex. Crim. App. 2004) (finding no evidence of willful withholding of DNA evidence where prosecutor stated he was involved in other matters at time of evidence production request and thought someone else would be appointed to handle case; nothing indicated that prosecutor's fax of discovery material to defense counsel three days after deadline was purposeful effort to thwart defense, and there was no evidence that prosecutor's request to proceed with trial despite failure to timely produce DNA evidence was calculated to deny defendant's right to speedy trial).

As evidence of willfulness in this case, Francis points to the following circumstances: (1) the machete was not mentioned in any discovery, including the offense report, witness statements, or Thomas's medical records related to the robbery; (2) the machete's existence came to light only after defense counsel observed the machete among the State's exhibits at trial, not as a result of any voluntary act by the prosecutor; (3) the State had possession of the machete for

pet. ref'd) (applying *Oprean* analysis when State offered evidence in guilt-innocence phase of trial that was withheld in violation of discovery order).

13

more than one month prior to trial; and (4) the State failed to disclose other evidence it introduced—threatening telephone calls Francis made to Thomas while in custody—in violation of the discovery order. Francis argues that these circumstances are akin to the circumstances in *Oprean*, which the Court of Criminal Appeals determined required the exclusion of evidence. *See* 201 S.W.3d at 728. I agree. I would hold that in failing to disclose the existence of the machete in its possession and Thomas's statement about its use in the course of Francis's assault on her, the State acted voluntarily and with the specific intent to violate the trial court's discovery order. *See id.* at 727–28.

Four months after the trial court entered the discovery order, Francis first learned, after the trial had already begun, that the machete was in the State's possession and that the State intended to question Thomas about Francis's threats to "cut [Thomas] up into little pieces" with the machete that he laid beside her as he was drawing a kitchen knife up and down her body. The police report and initial witness statements did not mention either a knife or a machete. The officers who responded to Thomas's 911 call saw no evidence that a knife was used in the commission of the offense. Thomas later described being threatened with a pocketknife or kitchen knife, however, and there was evidence that Francis had threatened others with a kitchen knife earlier. Francis was indicted for threatening

14

Thomas with a knife, not with a knife and a machete. Therefore, Francis's act of threatening Thomas with a machete was an extraneous offense.

No mention whatsoever was made of a machete in any report, in any files turned over by the State to the defense, or in the State's response to Francis's request for notice of intent to use extraneous-offense evidence. The State's report of its intent to use extraneous-offense evidence referenced the intent to use evidence that Francis had made threats to others with a kitchen knife, but it did not mention anything about a machete. Yet the State had obtained the machete in an interview with Thomas in September 2011, well over a month before the trial began on November 14, 2011, and it had determined that Francis used the machete to threaten Thomas with death, in addition to threatening her with a kitchen or pocketknife, beating her, and robbing her. The State retained the machete in its possession, intending to introduce it at Francis's trial for assault with a knife that was never recovered, and it included the machete among the exhibits it intended to offer at trial. It is uncontested that the defense became aware of the machete only when it discovered it among the State's trial exhibits—after the jury had been seated.

Francis's counsel objected repeatedly to the trial court that he had predicated Francis's defense preparation on insufficiency of the evidence to prove his guilt for assault with a knife, rather than an assault with fists, and not on assault with both a

15

knife and a machete.  At or near the time of the crime, Thomas reported only an assault with a knife; the police report contained no reference to a knife; and no evidence of the use of a knife in the assault was found or reported at the time of the crime—only evidence that Francis had beaten Thomas with his fists.

It is beyond question, to my mind, that Thomas's testimony that Francis threatened to cut her into little pieces could only refer to the machete that he laid beside her as he was drawing the kitchen knife or pocketknife up and down her body and threatening to "fuck [her] up" with it.  During Thomas's testimony, the machete—but no knife—lay in full view of the jury.  Had the machete not been offered into evidence and had Thomas not been allowed to testify about it, the jury would have had before it only Thomas's testimony about a knife that was never recovered or reported by the responding officers and which left no wounds on Thomas.

I can only infer, on the basis of the record in this case, that the prosecutor willfully withheld from the defense both the machete itself, which was in the State's possession, and notice of Thomas's statement to the prosecutor a month before trial that Francis laid the machete beside her and threatened to cut her into little pieces, knowing that this evidence was not in the police report or in any files turned over or made available to the defense.  The prosecutor also knew that she intended to introduce the machete and Thomas's testimony about it at trial.  And

16

she knew that the defense had prepared for trial in the belief that only a pocketknife or kitchen knife had allegedly been used during the course of Francis's assault on and robbery of Thomas and that no knife had been found, no wound had been made, and no machete had been mentioned.

I would hold, on the basis of this record, that the State acted willfully and with the specific intent to violate the trial court's discovery order and that the prosecutor's actions were a strategic and purposeful effort to thwart the defense's preparation of its case. *See Walker*, 321 S.W.3d at 22. I note specifically that the prosecutor did not suddenly discover the evidence such that compliance with the terms of the discovery order was impossible. *See Oprean*, 201 S.W.3d at 727–28. Moreover, the prosecutor's rationale and explanation for violating the discovery order—that she thought the machete was in the police report and that she "honestly didn't know that the defense didn't know about the machete"—are, to my mind, entirely implausible and self-serving. *See id.* Because I would hold that the State's withholding of the machete was a willful violation of the discovery order requiring exclusion of the evidence, I would turn to whether the admission of the machete was harmful error.

### 2.    *Harm*

In determining the harm that was caused by the trial court's admission of evidence that was willfully withheld by the State in violation of a discovery order,

17

we disregard the error unless it affects the defendant's substantial rights. *Oprean v. State*, 238 S.W.3d 412, 415 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd); TEX. R. APP. P. 44.2(b) (providing that we must disregard non-constitutional errors that do not "affect substantial rights"). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *Oprean*, 238 S.W.3d at 415 (citing *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997)). Here, the harm that the court reviews is the harm caused by the State's violation of the discovery order. *Id.* (citing *McDonald v. State*, 179 S.W.3d 571, 578 (Tex. Crim. App. 2005)). The court must consider the intended purpose of the discovery order: to prevent surprise and to permit Francis to prepare an adequate defense. *See id.* (citing *Hernandez v. State*, 176 S.W.3d 821, 825 (Tex. Crim. App. 2005) and *Ford v. State*, 73 S.W.3d 923, 926 (Tex. Crim. App. 2002)). The court must, therefore, analyze how the State's willful failure to comply with the discovery order affected Francis's ability to prepare for introduction of the machete into evidence and Thomas's testimony about its use and to formulate his defensive strategy. *See id.*

As both the State and the defense knew, assault with a deadly weapon, such as a knife, is a more serious crime than assault without such a weapon. And if the State had had no evidence or insufficient evidence that a knife was used in the crime, Francis would have been subject to conviction on a lesser offense. Instead,

18

the State produced a machete—an intrinsically more deadly weapon than a pocketknife or most kitchen knives—at trial and based its arguments on its use during the assault in addition to the use of the knife. I would conclude that the State's withholding of evidence about the machete was calculated to prevent Francis's preparation for the introduction of this evidence that the State knew would make an indelible impression on the jury and would have a strong influence on its verdict and its assessment of his sentence.

For the reasons set forth above, I would conclude that the prosecutor's willful violation of the trial court's discovery order by withholding both the machete and Thomas's intended testimony about its use was calculated to and did surprise defense counsel and affect his ability to formulate a trial strategy. Therefore, I would find the error harmful. *See Oprean*, 201 S.W.3d at 726–28; *Oprean*, 238 S.W.3d at 415–16 (finding that admission of videotape had "substantial and injurious effect or influence in determining the jury's verdict").

**Conclusion**

I would sustain Francis's first issue, reverse his conviction, and remand the case for a new trial.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Massengale, and Brown.

Justice Keyes, dissenting.

Publish.   TEX. R. APP. P. 47.2(a).

20